No. 53.—W. C. CLELAND and others, plaintiffs in error, *vs.* THOMAS J. WATERS and others, executors, &c. defendants in error.

[1.] When a testator, after naming sundry slaves, male and female, adds, " on account of the faithful services of my body servant, William, (the husband of Peggy,) I will and desire his emancipation or freedom, with the future issue and increase of all the females mentioned in this item of my will. If it is incompatible with the humanity, &c. of the authorities of the State of Georgia, I direct my qualified executors to send the *said slaves* out of the State of Georgia, to such place as they may select; and that their expenses to such place be paid by my executors out of my estate, and the whole proceedings be conducted according to the laws and decisions of the State of Georgia, I having no desire or intention to violate the spirit, or intention, or policy of such laws". Further—" I desire that the said slaves, if compelled, may select their residence out of the State of Georgia, and in any part of the world". The will directing the forfeiture of the interest of any legatee who resists this item : *Held,* that the intention of the testator was, to manumit *all* the slaves mentioned in that item of his will.

[2.] Where a will is absurd or ambiguous, as it stands, the Court may supply words to carry into effect the intention of the testator, when that intention is clearly manifested.

[3.] The manumission of slaves, to be sent out of the State, *it would seem,* is not in conflict with the public policy of the *laws* of Georgia.

In Equity, in Gwinnett Superior Court. Decision on demurrer, by Judge JACKSON, March Term, 1854.

Thomas J. Waters departed this life testate. The following is a copy of his will, excepting the 1st and 2d items.

" *Thirdly.* Whereas, I own and hold in possession the undernamed slaves, to-wit: Rory, Queen, his wife, her children, William and Rose, Mary's brothers, Pompey and Tom, Mary's sister Caroline, and Caroline's daughter, Dinah, (with the exception of Pompey, the above people are at present in Bryan County, in this State). Also, the following slaves in Gwinnett County, State aforesaid, to-wit: Polly, her. children, James, Morgan, (James and Morgan at present not in Gwinnett County,) Jefferson, Cherokee, John, Elizabeth, boy Swimmer, George, girl Polly, Peggy, sister to Polly, her children, Charles,.

Bowling, Betsey, Betsey's children, young Peggy, Catherine, Willey, Georgia, Thomas, infant girl, Josephine, Jenny, sister to Betsey, Jenny's children, to-wit: Sarah, Harriet, Hughes, Henry Clay and infant boy, Clark, Lydia, sister to Jenny, Lydia's children, Hannah, Jessey and infant boy, Susan *alias* Sukey, sister to Lydia, Sucky, infant girl, Caroline, Prudence, sister to Peggy, and Polly, Prudence's daughter, Cynthia. On account of the faithful services of my body servant, William (the husband of Peggy) I will and desire his emancipation or freedom, with the future issue and increase of all the females mentioned in this item of my will. If it is incompatible with the humanity, &c. of the authorities of the State of Georgia, I direct my qualified executors to send the said slaves out of the State of Georgia, to such place as they may select; and that their expenses to such place shall be paid by my executors, out of my estate; and that the whole of this proceeding be conducted according to the laws and decisions of the State of Georgia, I having no desire or intention to violate the spirit, or intention, or policy of such laws; and I do further direct, that if any person to whom any bequeath or disposition contained in this item offer any impediment to its being *carried into execution,* he or she shall, in no event, receive any part of my said estate; but my executors are enjoined to withhold from the person so opposing, any share or portion herein devised and bequeathed to him or her, and to distribute the share so forfeited among my other heirs, *per stirpes,* and not *per capita.* I desire that the said slaves, if compelled, may select their residence out of the State of Georgia, and in any part of the world".

*Fourth.* (Made a specific bequest to his executors in trust for two grand-daughters.)

*Fifth.* I give and bequeath to my qualified executors, all the rest and residue of my estate, both real and personal, and choses in action, in trust, that they will hold the same together, without any distribution, until all my directions, contained in the third item of this my will, shall have been fully, in all res-

pects, complied with; and so soon as that has been done, (and not before on any pretence) I direct that they shall divide my estate, real and personal, into three equal parts or shares; and I give, devise and bequeath one share or equal part thereof to my son Thomas J. Waters, his heirs, executors, administrators, and assigns, forever.

*Sixth.* I direct my qualified executors to hold, with the exception of one Thousand Dollars, exclusive of interest, say out my daughter, Williamina C. Cleland's share or portion of my real and personal estate, to be paid over to my son Thomas J. Waters, his heirs and assigns, trustee to my daughter Williamina C. Cleland and children, being amount of my note dated 25th July, 1840, and made payable to Thomas J. Waters, trustee, &c. This disposition and arrangement is in justice to Thomas J. Waters, and for his security, &c. During my life, I have given to my daughter, Williamina C. Cleland, and to her children, considerably more than this amount—more so than I have given to any of my other children. I wish it, however, to be distinctly understood, that my son Thomas J. Waters, his heirs and assigns, is to pay, as trustee as aforesaid, the above amount of One Thousand Dollars, exclusive of interest thereon, to his sister Williamina C. Cleland and children, out of his own individual resources or means—the amount is not to be considered (as he receives an equivalent or the same amount from his sister Williamina C. Cleland's share or portion from my estate,) a debt against my estate, or to be drawn from my real or personal estate, whatever. Nor is it to militate or take from one particle to the carrying out, by my qualified executors, the third item of this my will and testament. (The remainder of this clause and the *seventh* item gave the other two-thirds of his estate to his two daughters and their children.)

*Eighth.* And I direct my qualified executors, in the division of my negroes among my children, to divide the said negroes in families, so that the principles of humanity may be observed, and the separation from each other be as free from pain as possible. I also hope and pray (out of respect to my memory),

that the division of my estate be without wrangling or litiga-
tion, &c".

The last item appointed executors.

The testator possessed a large estate, including a large num-
ber of negroes not mentioned in the third item of his will.   A
number of those mentioned were lineal descendants of testator.
The others were of the same families.   A portion of these ne-
groes were in the possession of Thomas J. Waters, the son, by
his father's consent, at the time of his death.   Testator's chil-
dren were all of middle age, and had been provided for by him.

To a bill filed by the executors for construction of the third
item of this will, a demurrer was filed.   The Court below over-
ruled the demurrer, holding that the negroes therein enumera-
ted, were all emancipated.

This decision is assigned as error.

McDonald; Cobb & Hull, for plaintiff in error.

Hutchins; T. R. R. Cobb, for defendant in error.

*By the Court.*—Lumpkin, J. delivering the opinion.

The demurrer in this case was special, viz: that the third
item of the will of George M. Waters did not emancipate the
negroes therein named, except William, the body servant of
the testator, and the future increase of the female slaves men-
tioned.   The question was not made in the Court below, and
was expressly waived in the argument in this Court, as to the
legality of such emancipation; and we are called on simply to
determine what is the true construction of this will, as to the
slaves in controversy.

The first object of a Court in construing a will, should be to
discover, if possible, the intention of the testator, and to give
it effect, if it be legal; or, to vary the phraseology, effect should
be given to the intention, whenever it is not contrary to law,
and can be indubitably ascertained by permitted legal means.

In the pithy but somewhat quaint words of *Swinburne (Trea-*

*tise on Wills*, 1 *vol.* 19)—"The will or meaning of the testator is the queen or empress of the testament: because the *will* doth rule or govern the testament, enlarge and restrain the testament, and in every respect moderate and direct the same; and is, indeed, the very efficient cause thereof. The will, therefore, remaining of the testator, ought, before all things, to be sought for diligently; and being found, ought, in any wise, to be observed faithfully. It ought to be sought for as earnestly as the hunter seeketh his game; and as to the sacred anchor ought the Judge to cleave unto it, pondering not the *words*, but the *meaning* of the testator. For although no man be presumed to think otherwise than as he speaketh, (for the tongue is the utterer or interpreter of the heart,) yet cannot every man utter all that he thinketh; *and therefore, are his words subject to his meaning.* And as the mind is before the voice, (for we conceive before we speak,) so it is of greater power; for the voice is to the mind, as the servant is to his lord".

What, then, was the intention of the testator, as to the negroes named in the third item of this will? The plaintiffs in error insist that it was to manumit his faithful body servant, William, and the future increase of the female slaves. And the argument urged with much apparent earnestness is, that the testator, having confidence that his own children would deal kindly with the rest of the slaves mentioned in the third item, was willing to leave them in slavery: but that in the course of nature, these, his immediate offspring, could not live long enough to see to the kind treatment of the issue of these slaves; and hence, his desire to emancipate the issue. And we have been urged to give this exposition of his intention, because it is most consistent with the verbal, grammatical interpretation of the instrument, as it stands, without resorting to extraneous circumstances, or to the necessity of supplying words, as omissions by the draughtsman—in this case, the testator himself.

Can such an intention be imputed to the testator? We cannot bring ourselves to this conclusion. Various considerations force us to repudiate this conclusion. We will advert to a few of them.

Cleland *et al. vs.* Waters *et al.* executors, &c.

And first.   The eighth item of this will manifests a great anxiety upon the mind of the testator, that the principles of humanity should be regarded in the division of his slaves—so that "families should not be divided, and the separation from each other be as free from pain as possible".   Can it be consistent with this idea, that the testator should have intended to have the tender infants, the issue of these, evidently, his favorite servants, torn from their parents immediately upon their birth, and if refused an abiding place here, transported to some distant land?   For it is to be remarked, that the will makes no provision for the maintenance of the future increase, until they shall have arrived at the years of discretion.   The owners of their parents could hardly be expected to rear them without adequate compensation, and to deliver them up, to go free, so soon as they should be capable of rendering service.

So that, under this view, the intention of the testator must be held to have been, to disregard every principle of humanity —to outrage the holiest feelings of our nature, by the disruption of those very ties which he was so solicitous to preserve— to separate mothers from their minor children, and to send the latter off without the means of support; and that, too, in the face of his solemn declaration, that the very contrary of all this was his wish and will.

But this is not all.   William, his favorite slave, the only one in *esse*, whom, according to this view, he was unwilling to trust even in the hands and keeping of his family, must be separated from his aged wife and their numerous offspring, including the second, and perhaps third generation, and be sent off, "solitary and alone", to enjoy the fatal boon of liberty—by far too dearly purchased, as to him—leaving there his household— wife, children and grand-children, to continue in slavery!   No other family of his negroes must be divided—humanity forbids this—but as a reward for William's fidelity, this aged domestic must be torn from home and kindred, and sent back to the land of his fathers!

This consideration, alone, would convince us that such was not the intention of the testator.

There is another aspect in which this intention would be equally unreasonable. Many of these slaves, it is admitted, are the lineal descendants of the testator—"bone of his bone and flesh of his flesh". Is it natural that his bounty and benevolence should have overlooked these, so near of blood to him, to expend itself upon issue hereafter to be born—begotten by strangers?

Again, his children, the legatees in his will, are men and women of middle age. Many of the slaves mentioned in the third item, are infants. It is not probable—hardly possible—that these legatees should live to see the last issue born of these infants, and thus, to effectuate the benevolent purpose of the testator. However willing, therefore, Mr. Waters may have been to trust his favorite servants to the justice and generosity of his legatees, he must have foreseen that they could not, in the course of nature, survive long enough to extend and guarantee this kind treatment, through the distant future, to these people.

Further: Not only is this view unreasonable, because unnatural and ineffectual, but it is wholly impracticable. The entire estate of the testator is to remain in the hands of the executor, "without any distribution, until all the directions contained in the third item of the will shall have been fully, and in all respects, complied with. And so soon as that has been done, *and not before, on any pretence,* a division is directed". For seventy or eighty years, then, this estate is to remain undistributed. The legatees, his children, will, in all human probability, be dead, before enjoying any portion of his bounty. And the executor, *charged with the personal execution of this trust,* will have departed this life long before the time for its final consummation shall have arrived.

We are not forgetful of the verbal criticism of one of the learned and distinguished Counsel for the plaintiffs in error, upon the words " complied with", nor of his authority, (*Johnson's Dictionary,*) to show their meaning—" To acquiesce in; to be obsequious". And his deduction, that so soon as the le-

gatees shall have signified their assent to this disposition of the will, the time contemplated for a division would have arrived.

We would simply remark, that other Lexicographers, and Mr. Webster among the rest, give other definitions, such as to fulfil; to perfect or carry into effect; to complete; to perform or execute. And that these are not only the common and well known signification of the phrase, but that, in fact, in the 3d item of the will, the testator explains his own understanding of the term, by using as a synonym, "*carried into execution*".

If a Court of Equity were called upon to frame, by its decree, directions and instructions to the executor, for carrying into effect such intention as that imputed to the testator, could they be drawn? This issue and increase are to select their future home. To do this they must first arrive at years of discretion. No provision is made for their maintenance, in the meantime. Must each one be sent off separately, as they severally arrive at such years of discretion? During this long interval, what must become of the estate? These and many similar inquiries, present so many and such momentous difficulties, that the Court, rather than attempt its execution, would most probably declare the will void *pro tanto*, for uncertainty. Ought such an intention to be needlessly ascribed to the testator, seeing that it would lead to such consequences?

Another consideration, going to show that the construction I am combating is not admissible, is the recital, in the 3d item, of the names of many male slaves. Was this a mere act of supererogation? Had Mr. Waters no practical object to be accomplished by it? It is suggested, and likely with truth, that the names of the female slaves were set forth for the purpose of identification, and to determine whose issue should be free. But why specify the males? The answer to this question in the argument was, to assist in identifying the females. But this could not be, for in some cases, the males are identified by reference to the females. Thus: "Mary's brothers, Pompey and Tom". There must have been, then, another motive; and it is made our duty, in construing all instruments, whether public or private, statutes or deeds and wills—to give

effect to every part—every word—*ut res magis valeat quam pereat.*

Another view, fatal to the construction contended for, is derived from that clause in the 3d item, directing the executors to send "said slaves" out of the State, in a certain event. What *slaves*? There is but one, according to the position occupied by Counsel for plaintiffs in error, and that is William, the body servant. The issue are not in *esse*; and consequently, cannot properly be spoken of as "said slaves": and if in *esse*, they would not be slaves, because, being manumitted prior to birth, they would be born *free.*

We have occupied much more space than we intended, to rebut the idea, that such was the intention of the testator. There are still behind, other views confirmatory of those already advanced, that the Attorneys of the plaintiffs have not correctly expounded the will of Mr. Waters, as to what was his intention respecting the slaves designated in the 3d item of that instrument, as to be collected from the will itself. We are satisfied, beyond a doubt, that it was the purpose of the testator to emancipate *all* the slaves embraced in this clause. The most casual reading of the whole paper would impress that opinion upon any unbiased mind; and a more careful examination of each item serves only to strengthen this conviction. The testator's anxiety seems to have been so great upon this point, that it stands forth prominently, even in other parts of the will unconnected with it. It is affixed as a condition precedent to every legacy, save that embraced in the 4th item: That this darling object is to be first effected; and any legatee throwing obstructions in the way, is made to forfeit all interest under the will. The fact extraneous to the will of the blood relationship of a large number of these negroes to the testator, would remove the last particle of doubt, did any remain upon our mind.

The next and more difficult question is, does the will sufficiently express the intention of the maker, to enable a Court to decree its execution? Or is it necessary to supply words for that purpose?

My brethren are not entirely clear upon this point. For myself, I incline strongly to the belief that it is. The whole testament bears upon its face evidence of an unskilful scrivener; yet, while extremely inartistic, as a whole, there are technical terms used, which indicate, infallibly, a lawyer's handiwork. The presumption is, that this will was copied from another, and that the attempt was made to modify the provisions of the former; that the first was the work of a skilful, the last of an unskilful hand. There is evidently something omitted in the third item, arising, probably, from the long enumeration of the negroes' names. Still, I am inclined to think there is enough left to effectuate the intention of the testator. That purpose we have arrived at, viz: Manumission.

It is proper to premise, that no form of words is necessary to do this. There is no potent word, such as "*dedi*" in a deed, or "heirs" in an estate of fee simple, at Common Law, necessary to accomplish this object. Slavery is the dominion of the master over the slave—the entire subjection of one person to the will of another. Manumission is the withdrawal or renunciation of that dominion. Whatever, therefore, indicates such withdrawal or renunciation, whether expressly or impliedly, effectuates manumission. Hence, we find in every nation where slavery has existed, implied as well as express manumission. The making of a deed to a villein—the bringing of a suit or complaint against him, says *Blackstone*, manumitted him by implication: Because the Lord, by dealing with him as a freeman, thereby admitted that he ceased to be a slave. Before the introduction of deeds into common use, various simple but significant modes of express manumission were adopted by the various countries holding slaves, each of them indicating the withdrawal of dominion by the master.

In the case of *Bryan vs. Walton*, (14 *Ga. R.* 185,) I had occasion to refer to some of the modes in common use among the Romans. One method among the Germans was termed manumission *per quartuor viis;* and consisted simply in leading the slave to a place where two roads crossed; and in a set,

phrase, giving him the liberty of choosing his own route.    (See *Heineccii Opera, Tom.* 6, *p.* 20 *to* 25 *inclusive*, and *Potgies-serus De Statu. Suvorum*, 490, for the numerous modes which were practised for manumitting slaves.)

Are there not words, then, in this will, indicating the desire of the testator, to renounce his dominion over these slaves? After naming them he adds—"on account of the faithful services of my body servant, William, (the husband of Peggy,) I will and desire his emancipation or freedom, with the future issue and increase of all the females mentioned in this item of my will.    If it is incompatible with the humanity, &c. of the authorities of the State of Georgia, I direct my qualified executors to send the *said slaves* out of the State of Georgia, to such place as they may select," &c.

Who are the *said slaves?*    We are told, that by the rules of strict grammatical construction, these words refer to their immediate antecedents, viz: William and the future issue. And we have remarked, that that antecedent has not the proper requisites to satisfy the plural, "slaves".    William is a single slave.    The issue are not *in esse*, and when born, are not slaves: because manumitted and born free.    Moreover, this issue cannot satisfy the other description, viz: persons of discretion, capable of selecting a destination.    Besides, in carrying into effect the intention of a testator, Courts will disregard strict grammatical construction, and will, if necessary, transpose words or even portions of a sentence.    (1 *Jarman on Wills*, 437, *and authorities there cited.    Covenhoven vs. Shuler*, 2 *Paige*, 122.)

Our opinion is, therefore, that the "said slaves" are, *ex vi termini, all* the slaves mentioned in the previous part of the 3d item.    And this opinion is confirmed by the last clause in this item, where the testator repeats—"I desire that the 'said' slaves' if compelled, may select their residence out of the State of Georgia, and in any part of the world".    The same words evidently have the same meaning, when used in different places in the will, and refer, obviously, to adults who are capable of choosing.    And William, his body servant, being the only

Cleland *et al. vs.* Waters *et al.* executors, &c.

one answering to this description, except those named in the. 3d item, the necessary conclusion is, that they are embraced in this term.

But if we are wrong in this, would not the Court supply the necessary words to effectuate the intention of the testator? It is not denied that the Court has the authority to do so in certain cases. It is insisted, however, in the argument, that this is not one of them; and numerous and satisfactory authorities have been adduced, to show that however fully persuaded the Court may be, as to the intention of the testator, words will never be supplied, where the will, as it stands, makes a clear and complete disposition of the property.

The true rule, we apprehend, upon this subject, is laid down by Mr. *Williams*, (*Treatise on Ex'rs,* vol. 1, *p.* 299,) which is this: That to authorize the addition of words in a will, two conditions must intervene, viz: 1st. Some ambiguity or absurdity, on the face of the will, ascribable to something omitted; and, 2dly. Manifest and convincing proof that the omission was contrary to the intention of the testator. This rule in no wise conflicts with the plaintiff's authorities.

The 2d condition in the rule is answered fully, we conceive, and have endeavored to show, by the provisions of the will itself. Is there, then, any uncertainty or absurdity on the face of the instrument? If the words, "said slaves", do not refer to the slaves mentioned in the 3d item, how account for the folly of mentioning a large number of slaves, and with such particularity, especially as it respects the males or a portion of them, without object, unless to make disposition of them?

The name of a legatee is wanting, which makes this case very similar to that of the *Lessee of Weltham vs. Turner,* (2 *Dowl. & R.* 398.) There the will was in these words: "I give unto H W a messuage or tenement, now in the possession of W. Item. I give further unto my nephew, H W, half part of my garden and £100 stock in the 4 per cent. Bank annuities. *I give, further, my said stables, cow-house and all other out-houses in the said yard*—my sister M W to have the interest and profits during her life". The Court supplied the

words, "to him" in the last clause.   For numerous other cases to this point, see 1 *Jarman on Wills, ch. XVI.*

Again, the 3d item says : "If it is incompatible with the humanity, &c. of the authorities of the State of Georgia, I direct," &c.   If what is incompatible?   The sentence is unquestionably unfinished.   It is meaningless, as it now stands.   After "the State of Georgia", insert the words, to free the said or above named slaves, and you give sense and completeness to the passage.   I venture the prediction, that if the original of this testament is ever found, or the notes of instruction by which it was written, these or similar words will be found in it, at this place.

So that, were it necessary so to decide, we would supply the proper words, rather than that the will of the testator should miscarry.

Another view of the 3d item has occurred to us.   Admitting the testator's intention to manumit, *in Georgia,* was limited to William and the future issue of the females.   In the event of this design being incompatible with the humanity, &c. of the authorities of the State, then *all* of the said slaves are to be sent out of the State ; or in other words, as if he should have said, "I manumit William and the future issue of the females, and wish the others to remain slaves, if William and the issue can remain in this State, convenient to the others.   But if this cannot be done, then I desire *all of them* to be sent together, to some foreign State, to be selected by them".

This construction is equally liberal with that contended for by the plaintiffs, and to my mind, much more plausible ; still, candor constrains me to say, that my opinion is, that it was the intention of the testator to manumit *all* the slaves included in the 3d item, in any event.

We have been strongly urged in construing this will, to lean to that interpretation most unfavorable to manumission, on the ground that the favor shown to liberty by the Common Law, (1 *Coke Litt.* 124, *b*) or as *Fortescue* hath it, *Angliæ jura in omni casu libertati dant favorem,* does not apply to negroes in Georgia—the granting of freedom being against the express

provisions of our Statutes, and opposed to the public policy of our laws.

This point is entitled to grave consideration.

By the Constitution of the United States, Congress were prohibited from preventing the importation of slaves into this country, prior to the year 1808, and that the people of the South, at the time of the adoption of the Federal Constitution, may have considered not only the retention, but the increase of their slave population, to be all-important to the interest and welfare of their States, may be legitimately inferred from this express reservation in the Constitution ; yet, anticipating by ten years any action.by the General Government, the people of Georgia forbade, by their Constitution and Laws in 1798, the further importation of slaves into this State, from Africa or any other foreign place, as well as from any other State in the United States.

The preamble to the Act of January, 1798, passed some four months before the adoption of the Constitution of that year, recites, that "whereas a practice hath hitherto prevailed of importing great numbers of slaves into this State for sale, from Africa and elsewhere, which is not consistent with the principles of benevolence and humanity, or consonant with the true interest and prosperity of the State," &c.   And it proceeds to prohibit their further importation after six months, from all foreign places, under the penalty of one thousand dollars for every negro imported, and from any other State in the United States, after three months, under the penalty of five hundred dollars. (*Watkins' Digest*, 673–4.) The Constitution adopted on the 30th of May thereafter, declares that there shall be no future importation of slaves into this State, from Africa or any foreign place, after the first day of October next ensuing. (*Art. IV.* §11, *Cobb's Digest*, 1125.)

And this provision in our Organic Law, remains unrepealed to this day.

The Act of 1801, (*Prince*, 787) passed a few years afterwards, was to prescribe the mode of manumitting slaves *in this State.* Section 1st enacts, that this can only be done by the

Legislature.   Section 2d provides a penalty of $200 for the offence of setting free any slave in any other manner, and further declares, that any slave so manumitted, contrary to the Act, shall still be a slave to all intents and purposes.   Section 3d makes it unlawful for the Clerk of the Superior Court, or any other officer, to record any deed of manumission, or any other paper having for its object the setting free of any slave, and annexes a forfeiture of $100 for this offence.

And thus the law stood, up to 1818, when the Legislature passed a supplementary Act, more effectually to enforce the Act of 1801.   (*Prince,* 794.)

The preamble to this Act recites, that " whereas the principles of sound policy, considered in reference to the free citizens of this State, and the exercise of humanity toward the slave population within the same, imperiously require that the number of free persons of color *within this State,* should not be increased by manumission, or by the admission of such persons from other States to reside therein; and whereas divers persons of color, who are slaves by the laws of this State, having never been manumitted in conformity to the laws of the same, are nevertheless in the full exercise and enjoyment of all the rights and privileges of free persons of color, without being subject to the duties and obligations incident to such persons, thereby constituting a class of people equally dangerous to the safety of the free citizens of this State, and destructive of the comfort and happiness of the slave population thereof, which it is the duty of this Legislature, by all just and lawful means, to suppress."

Section 1st directs, that the Act of 1801 should be strictly enforced, and increases the penalties therein provided.   Under the 3d section of the Act of 1801, forbidding any deed or other paper to be recorded, which had for its object the manumission of slaves, the Courts of this State held, that the whole instrument was null and void.   Section 2d of the Act of 1818, declares that the said 3d section of the Act of 1801, should be construed to extend to inhibit the recording only of so much of any instrument as shall relate to manumission.

Section 3d forbids free persons of color from coming into this State (seamen excepted. There are subsequent Statutes, regulating this subject) on pain of $100, and on failure to pay, to be sold into slavery. Section 4th enacts, that every will, deed, whether by way of trust or otherwise, contract, agreement or stipulation, or other instrument, in writing or by parol, made and executed for the purpose of effecting or endeavoring to effect the manumission of any slave, either directly or by conferring or attempting to confer freedom on such slave, indirectly or virtually, by allowing and securing, or attempting to allow and secure to such slave, the right or privilege of working for himself, free from the control of the master or owner, or of enjoying the profits of their labor and skill, the same are declared to be utterly null and void; and the person making, or concerned in attempting to give effect to the same, whether by accepting the trust or in any other manner whatever, shall be liable to a fine, not exceeding one thousand dollars; and every slave thus attempted to be set free, is liable to be arrested and sold at public outcry.

The remaining sections of this Act, prescribe certain duties to be performed and observed, by free persons of color; and upon failure to comply, subjecting them to seizure and sale into perpetual servitude; except section 10th, which makes it the duty of all Courts and Judges to construe the Act and carry the same into operation, *according to the spirit, true intent and meaning thereof, as set forth in the preamble.*

In 1824 an Act was passed, repealing all laws and parts of laws, which authorized the selling of free persons of color into slavery. (*Prince,* 800.)

The preamble to the Act of 1829, recites that, "whereas it frequently happens that the citizens of this State decline a permanent guardianship of free persons of color, by which the ends of justice are prevented." And the Act makes provision that free persons of color may appear, by the aid of a next friend; and further, to facilitate the same object, it authorizes guardians of free persons of color to resign their appointment at any time. (*Prince,* 802.)

The preamble to the Act of 1835 (*Prince* 809) more effectually to protect free persons of color, and which is re-enacted in *totidem verbis*, by the Act of 1837, (*Cobb* 1011) states that "free persons of color are liable to be taken and held fraudulently and illegally in a state of slavery, by *wicked white men*, and to be secretly removed, whenever an effort may be made *to redress their grievances;* and that due inquiries cannot be had into the circumstances of their detention, and *their right to freedom,* for remedy whereof," &c.

The foregoing analysis will suffice to indicate, I might say vindicate, the temper and tone of our legislation in reference to slavery.   And notwithstanding the persevering efforts which have been made by the fanatics of the North to jeopard the safety of our people—rob them of their property—desecrate and disregard their constitutional rights, and violate and harrass their domestic peace, it is truly gratifying to contemplate the justice, wisdom and moderation of our Legislature, respecting slaves and free persons of color.   All the cruel attempts of these infuriated incendiaries have, hitherto, utterly failed to influence our people to forget their duty to themselves and this dependent race.   Every Act upon our Statute Book, in reference to them, is replete, upon its face, with undeniable proof of that dispassionate deliberation which is the true characteristic of a great and magnanimous people.   Humanity to our slaves and free persons of color, and a just regard to their rights and welfare, have never, in a single instance, been overlooked or unheeded.

The Constitution of 1798, whether wisely or not, established the fact, that the people of Georgia repudiated the policy of the further importation of slaves from abroad.   Their views, as it respects their introduction from other slave States of the Union, have been more vacillating.   We have already seen that as early as January, 1798, the Legislature passed a stringent *prohibitory* Act upon this subject.   And it is worthy of notice, as explanatory of the spirit of the times, that the Grand Jury of Wilkes County, at the November Term preceding the passage of this Law, as appears from the minutes of the Court,

with *Elijah Clark* as their foreman, made a strong present-ment in favor of the measure, as will appear by the following extract:

"We present as a grievance of the most alarming nature, the importation of negroes into this State, *whether by land or sea,* for the purpose of exposing them to sale, inasmuch as we conceive it to be greatly injurious to the welfare of the inhabi-tants thereof, *and highly repugnant to the principles of a free Government*—and do earnestly recommend it to the next Le-gislature to prohibit the same".

By the Penal Codes, both of 1816 and 1817, the introduc-tion of slaves into the State, "either by land or water," was made highly penal, (*Lamar's Digest,* 608, 650,) unless brought by settlers. The Act of 1824 repealed the Act of 1817 ; the Act of 1829 revived the prohibitory Act of 1817. In 1841, it was again repealed ; and in 1842, again revived. In 1849–'50, it was again repealed and all offenders relieved from prior transgressions. And in January, 1852, the preceding Act was again repealed, and the prohibitory law amended and revived. And thus, after travelling in a circle for the last half century, we have returned to the point from which we started. And there this subject, *for the present, rests,* having settled nothing permanently respecting it.

While public opinion has never wavered in this State, for the past fifty years, so far as *domestic* manumission was concerned, the same steadfastness of purpose has not been manifested, as to extra-territorial and foreign colonization. The policy of transporting our free blacks to Liberia, received at its com-mencement in 1816, the sanction and approbation of our great-est and best men. The Honorable *William H. Crawford* was, I believe, one of the Vice Presidents elected at the organiza-tion of the American Society. And Mr. Justice *Wayne,* of the Supreme Court Bench, and others of our most distinguished citizens, continue still to give it their countenance and support.

In 1817, by an Act yet in force, the Governor was directed to deliver to the Colonization Society Africans illegally import-

ed into this State, and "to aid in promoting the benevolent views of said society, in such manner as he may deem expedient". (*Cobb's Digest*, 989.) By resolution again in 1820, certain Africans, illegally imported, were offered to this society. (*See Res. of* 1820, *vol. IV. p* 5, *of Resolutions.*)

In 1824, a resolution from the State of Ohio, on the subject of the abolition of slavery, having been laid, by the Governor, before the Legislature, and the report which was adopted thereon, after expressing regret "at this unnecessary interference on the part of a sister State," concludes with this sentence: "Georgia claims the right, with her southern sisters, whose situation, in this regard, is similar, of moving this question when an enlarged system of benevolent and philanthropic exertions, in consistency with her rights and interest, shall render it practicable". Is it not apparent, that up to this period, the true character of the institution of slavery had not been fully understood and appreciated at the South; and that she looked to emancipation, in some undefined mode, in the uncertain future, as the only cure for the supposed evil? Thanks to the blind zealots of the North, for their unwarrantable interference with this institution. It has roused the public mind to a thorough investigation of the subject. The result is, a settled conviction that it was wisely ordained by a forecast high as heaven above man's, for the good of both races, and a calm and fixed determination to preserve and defend it, at any and all hazards.

Governor Troup, ever zealous for the honor and safety of the State—the purest of patriots and the most incorruptible of men, brought this subject prominently before the Legislature, at its extra Session in 1825. He urged them to "temporize no longer; that one national movement for its overthrow, unresisted, all would be lost; that like the Greeks and Romans, the moment we ceased to be masters we should become slaves; that the institution constituted our moral and political strength; that if slavery were abolished, we should stand stripped and desolate under a fervid sun and upon a generous soil, a mockery to ourselves, and the very contrast of what, with a little firmness and foresight, we might have been. And while it was.

not too late, he entreated the South to step forth, and "*having exhausted the argument, to stand by their arms*".

But this heroic champion of the South, and staunch defender of *Constitutional Union*, was in advance of his age. The fervid appeal was responded to by a special committee, to whom this portion of the message was referred, in the same tone of haughty defiance in which the communication was written. And both documents being denounced by the press, and politicians, and people of the times, as treasonable to the Union, were suffered to sleep the sleep of death.

In 1827, the question as to the right and propriety of the Congress of the United States appropriating money from the public Treasury, in aid of the Colonization Society, was fully discussed by the Legislature; and it resulted in the adoption, by that body, of a very able report and resolutions, condemnatory of the project. The General Assembly, speaking in behalf of the people of Georgia, say, "They know and strongly feel the advantages of the Federal Union; as members of that Union, they are proud of its greatness; as children born under that Union, they will ever defend it from foes internal as well as external: but they cannot and will not, even in preservation of that union, permit their rights to be assailed; they will not permit their property to be rendered worthless; they will not permit their wives and their children to be driven as wanderers into strange lands; they will not permit their country to be made waste and desolate by those who come among us, under the cloak of a time-serving and hypocritical benevolence."

"At the first establishment of the Colonization Society, whatever may have been intended or avowed as its object, your committee believe that they can say with truth, that the general impression in the Southern States as to that object was, that it was limited to the removal, beyond the United States, of the *then* free people of color and their descendants, and none others. Under this impression, it at once received the sanction and the countenance of many of the humane, the wise and patriotic among us. Auxiliary societies were formed in our

own State, and the members—the influence and the resources of the society—were daily increased. It is now ascertained that this impression was false; and its officers and your committee believe the society, itself, now boldly and fearlessly avow that its object is and ever has been, to remove the whole colored population of the Union to another land: and to effect this object—so wild, fanatical and destructive in itself—they ask that the general fund, to which the slave-holding States have so largely contributed, should be appropriated for a purpose so especially ruinous to the prosperity, importance and political strength of the Southern States." (*Dawson's Compilation, p.* 84 *of the Resolutions.*)

And again, in 1828, the Legislature having under consideration resolutions from the States of South Carolina and Ohio, which latter State has, for the want of employment at home at sundry times, manifested a very tender concern for ours, say, " These States must view with jealousy and distrust all associations, having for their object the abolition of slavery. The principles propagated by the enthusiastic devotees of this project, are calculated to have the most pernicious effects: exciting false hopes of liberty; producing discontent and dissatisfaction in the mind of the otherwise happy and contented slave, and a restlessness for emancipation, when the actual state of things forbids the possibility of it at present. The Colonization Society is considered, by your committee, as one of a dangerous character in this respect. Its schemes of colonization are vain and visionary. Its professed objects never can be accomplished. They are wholly impracticable. This institution, therefore, should not, in the opinion of your committee, receive the support, countenance or patronage of Congress. And not being a matter of national interest, the Government has no right to take it under its protection, or make appropriations for its support." (*Dawson's Compilation, p.* 116 *of the Resolutions.*)

So much for our legislation upon this subject. The matter has undergone judicial investigation before the Courts of this State.

Cleland *et al. vs.* Waters *et al.* executors, &c.

James A. Bradley, by his will, among other things, directed that if any of his slaves should desire to go to the African Colony they should be permitted to do so ; and their expenses to the port of embarkation should be paid.   A bill was filed by Reuben Jordan, the executor, to which the heirs and distributees were made parties, asking the direction of the Court as to the execution of the will.   In opposition to this emancipation clause, the Act of 1818 and the preceding Acts were relied on, declaring, in substance, as we have seen, that any will or other instrument intended to give freedom to slaves, should be null and void.   But Judge Crawford held, that the will was not obnoxious to these Statutes, nor inconsistent with the policy of our laws.   And this decision, if I am correctly informed, was unanimously affirmed by the Judges in Convention—a bench composed of men, who, in the prophetic, but quaint language of Fuller, in speaking of Lord *Coke*, will be memorable "while fame has a trumpet left her or any breath to blow therein."

In delivering the opinion in that case, the Court say (*Dudley*, 170): "The Act of 1818 and those which preceded, were intended to prevent the emancipation of people of color in this State, where their presence could not fail to be injurious to the slave population.   This is the evil intended to be prevented; and it is to guard against this evil, that the provisions of the said Statute and those which preceded it were enacted.   This will does not contemplate that the slaves emancipated by it will remain in the State, to the annoyance and injury of the owners of slaves.   It, therefore, does not come within the reason of the law.   It is not calculated to produce the mischief intended to be guarded against by the Legislature of the State upon this subject.   The policy of our legislation, since 1798, has certainly been unfavorable to the increase of the number of slaves in this State.   The Constitution of that date roundly prohibits the importation of slaves into this State, from Africa or other foreign places, after the first day of October of that year."

"Upon the best consideration which the Court has been able to bestow on this case, it is of the opinion that neither

the letter, nor intention of the several statutes of this State are in opposition to the provisions of the will of James A. Bradley, deceased, in regard to his slaves. The preamble to the Act of 1818 shows, conclusively, the nature of the evil intended to be remedied by that Act; and that evil will not be produced or increased by the execution of this will, in accordance with the obvious intentions of the testator. Neither the laws nor the settled policy of the State interpose any obstacle to its execution in relation to the slaves."

And let it be borne in mind, that it was made the duty of *all* Courts and Judges, before whom *any* proceedings may be had under the Act of 1818, "so to construe the several provisions thereof, as to carry the same into full and complete operation, according to the true spirit, intent and meaning thereof, *as declared in the preamble of the same.*"

This point again came before Judge CHARLTON of the Eastern District, and was ruled the same way, although, at that time, he had not, it seems from a note appended to the report of the case, seen the decision in Dudley. There is a remarkable resemblance between the emancipation clauses in that will and this. It is not unlikely that the *Judge* in the one case was the *draftsman* in the other. The will of John Dugger, Jr. contained (amongst others) a clause in the following words: "It is my will and desire, should it please God to remove me at this time, that my negro woman, Antoinette and her two children, together with my negro man Jack, should be emancipated and set free, if it can be done in any manner, either by the Legislature or otherwise; and if it cannot be accomplished, then I direct my executors hereinafter named, to send them where it can be done out of the State." *Kaser vs. Marlow et al.* (*R. M. Charlton's R.* 542.)

The Court says: "I do not acquiesce in the decision of the Honorable the Court of Ordinary, in causing the whole of the clause relating to these slaves to be expunged from the will. It is a cardinal rule in the construction of wills, that the interpretation should be favorable and as near the mind and intent of the party, as the rules of law will admit. So it is, if the

words will bear two senses, one agreeable to and another against law, that sense shall be preferred which is most agreeable thereto. Taking these rules for our guides, we might make this will perfectly legal and operative, in regard to these slaves, by expunging the word "either" and "or otherwise"—(and it is only the illegal part that ought not to be recorded)—and then it will read thus: "It is my will and desire, should it please God to remove me at this time, that my negro woman Antoinette, and her two children, together with my negro man Jack, should be emancipated and set free, if it can be done in any manner by the Legislature; and if it cannot be accomplished, then I direct my executors hereinafter named, to send them where it can be done out of the State." Is there any thing illegal in this? Would such a will come in conflict with the policy of our Statutes upon the subject? John Dugger might, in his life-time, have applied to the Legislature to manumit these slaves, without incurring any penalty. And may he not ask his legal representative to make the same application after his death? At any rate, if the rights of creditors do not intervene, (and the executors have not shown such rights to exist) an individual has assuredly the power to send his slaves out of the State for any purpose, although he might not be permitted to bring them back. Can he not ask, by his last will and testament, that this should be done by those to whom he has entrusted his property, and who are sworn to obey his instructions?

"The intent of the Statutes is expressed in the preamble to the Act of 19th December, 1818. (*Prince's Digest (old)* 465, (*new*) 795.) The object of the Statute's relating to manumission, was to prevent a horde of free persons of color from ravaging the morals and corrupting the feelings of our slaves. Experience has taught our legislators that such a class, lazy, mischievous and corrupt, without any master to urge them to exertion, and scarcely any motive to make it, was an extremely dangerous example to our naturally indolent slaves. They, therefore, declared that such a class should not be increased by manumission (save by consent of the Legislature) or by the admission of such persons from other States to reside therein.

The Legislature, then, is the proper tribunal (if I may use that term) to determine whether the case presented, is one in which none of these dangers exist—one for which reason and human- ity plead.   To them, the executors, in the discharge of one of the most solemn of all duties, the performance of the dying in- junctions of their friend, should make the application, and if it should be refused, then they should fulfil the alternative com- mand of their testator, by sending these slaves out of the State."

When this question came incidentally before this Court, in Vance vs. Crawford, (4 *Ga. R.* 460) it was no longer viewed as an open question.   The adjudications referred to, especially the former, had obtained general notoriety.   It was made at the seat of Government, during the session of the General As- sembly, and if I remember right, was published in the newspa- pers of the day.   It had, when this Court was first organized, been looked to as the settled construction of the law, for fifteen years, and no attempt had been made by the Legislature to dis- turb it, or if made, was unsuccessful.   This Court did not feel at liberty, therefore, to interfere with a judgment thus solemn- ly and authoritatively pronounced, and so long acquiesced in. And having, heretofore, in *Bryant vs. Walton*, (14 *Ga. R.* 185) expressed my views pretty fully upon this subject, I am content to leave it, with this rapid retrospect at the past action of the State concerning the matter, both legislative and judi- cial.   Whatever change is made, *if any*, should be by the law- making, rather than by the law-administering department of the government.

It was said of Chief Justice *Bridgman*, while at the bar, that "he always argued like a *lawyer* and a *gentleman*."   I can- not, in conclusion, in justice to my own feelings, forbear to apply this highest of all professional commendation, to the dis- tinguished Counsel who have conducted this cause.

Note.—Judge LUMPKIN, although present at the discussion, consultation and decision of this case, was not present when the judgment of the Court was pronounced.   It fell to his lot,

however, to write out the opinion.   It is due to Judge BENNING to state, that he took occasion to say that he did not consider himself committed as to the construction put upon the Acts of 1801 and 1818, prohibiting manumission.—REPORTER.