Cleland *et al. vs.* Waters *et al.* ex'rs, &c.

No. 10.—WM. C. CLELAND *et al.* plaintiffs in error, *vs.* THOMAS J. WATERS *et al.* executors, &c. defendants in error.

[1.] A testator, by his will, made the following bequest, to-wit: "Whereas, I own and hold in possession the undernamed slaves" (naming sundry slaves). "On account of the faithful services of my body servant, William, (the husband of Peggy,) I will and desire his emancipation or freedom, with the future issue or increase of all the females mentioned in this item of my will. If it is incompatible with the humanity, &c. of the authorities of the State of Georgia, I direct my qualified executors to send the said slaves out of the State of Georgia, to such place as they may select; and their expenses to such place shall be paid by my executors out of my estate; and my will is that the whole of the proceedings be conducted according to the laws and decisions of the State of Georgia—I having no desire or intention to violate the spirit, or intention, or policy of such laws. And I do further direct that if any person to whom any bequest or disposition made in this item, offer any impediment to its being carried into execution, he or she shall in no event receive any part of my said estate; but my executors are enjoined to withhold from the person so opposing, any share or portion herein devised or bequeathed to him or her; and to distribute the share so forfeited amongst my other heirs, *per stirpes* and not *per capita.* I desire that the said slaves, if compelled, may select their residence out of the State of Georgia, and in any part of the world:" *Held,* 1. That the intention of the testator was to manumit *all* the slaves mentioned in this item of the will. 2. That it was the wish of the testator for the slaves to be set free and remain in Georgia, provided the consent of the Legislature could be obtained for that purpose; otherwise, they were to be removed beyond the limits of the State, they to select the place where they could be free. 3. That such disposition is not repugnant to the laws of the State; and 4. That the policy of a State is to be gathered from its constitution and laws.

In Equity, in Gwinnett Superior Court. Tried before Judge JACKSON, September Term, 1855.

The only question made in this case was, as to the validity of the following item in the will of George M. Waters;

"3d. Whereas, I own and hold in possession the undernamed slaves, to-wit: (naming sundry slaves). On account of the faithful services of my body servant, William, (the husband of Peggy,) I will and desire his emancipation or freedom, with the future issue and increase of all the females mentioned in this item of my will. If it is incompatible with the humanity, &c. of the authorities of the State of Georgia,

Cleland *et al. vs.* Waters *et al.* ex'rs, &c.

I direct my qualified executors to send the said slaves out of the State of Georgia, to such place as they may select; and their expenses to such place shall be paid by my executors, out of my estate; and that the whole of this proceeding be conducted according to the laws and decisions of the State of Georgia—I having no desire or intention to violate the spirit, or intention, or policy of such laws; and I do further direct, that if any person to whom any bequest or disposition contained in this item, offer any impediment to its being carried into execution, he or she shall, in no event, receive any part of my said estate; but my executors are enjoined to withhold from the person so opposing, any share or portion herein devised or bequeathed to him or her, and to distribute the share so forfeited among my other heirs, *per stirpes* and not *per capita*. I desire that the said slaves, if compelled, may select their residence out of the State of Georgia, and in any part of the world.''

The Court below held this item to be valid, and not repugnant to the Acts of 1801 and 1818. This decision is assigned as error.

McDONALD; COBB & HULL, for plaintiff in error.

HUTCHINS, PEEPLES, T. R. R. COBB, for defendant in error.

The Court not being unanimous, delivered their opinions *seriatim.*

*By the Court.*—LUMPKIN, J. delivering the opinion.

When this case came before this Court at Gainesville, October, 1854, we held, unanimously, that it was the *intention* of the testator, to manumit *all* the slaves mentioned in the third item of his will. (16 *Ga. Rep.* 496.) And the only question now is, can that intention be executed?

It is insisted that it cannot, because it is an attempt to free the slaves and suffer them to remain in Georgia. If this was a bequest of freedom to the slaves, to take effect immediately

in this State, it would, undoubtedly, be void. But such is not our interpretation of the will. We read it precisely as Judge JACKSON did; that the wish of the testator was, for his slaves to be free and remain in Georgia, "if compatible with the humanity of the public authorities;" that is, by permission of the Legislature. It was, in other words, a direction to his executors to apply to the Legislature to free the slaves and let them remain in the State. This the testator could have done in his lifetime; and this he could direct to be done by his executor after his death. For, although it may not be unqualifiedly true, that an individual may do as he pleases with his own property during his life, and by his testament, delegate to another the same right after his death; still, it is not pretended that such an attempt *as this*, by the testator, in his lifetime, or direction to his representative after his death, would have contravened any law of the land.

Indeed, the Act of 1801 clearly recognizes the right of the owner to apply to the Legislature to free his negroes. (*Cobb's Dig.* 983.) And the 11th section of the 4th article of the Constitution, by prohibiting the Legislature from passing laws for the emancipation of slaves, without the consent of their owners previously had for that purpose, concedes, by necessary implication, the right of the owner to apply to the Legislature to exercise this power. (*Cobb,* 1125.)

Our construction therefore is, that Mr. Waters directed, by his will, his executors to apply to the Legislature to free his slaves and let them remain in the State; and that this application being made within a reasonable time, (none being specified,) and failing, by the refusal of the Legislature to pass the Act, then he desired his executor to take them beyond the limits of the State—they to select their place of abode—where they could be free.

It is contended that, conceding the slaves were to be removed beyond the limits of the State, in order to *acquire*, as well as to *enjoy*, freedom, that the will is nevertheless inoperative, for various reasons: some of the most prominent of which we will proceed to notice:

First, because the election is given to the slaves to choose where they will go; and that they are incapable of making this choice. And in support of this position, *Carroll and Wife vs. Bumby, adm'r,* (13 *Ala. Rep.* 102,) is cited and relied on. The decision in that case was upon a point somewhat different from the present, namely : a choice on the part of the slaves between freedom and servitude. Here it is simply as to their future residence. The question is as to *removal* and not of *emancipation*. Grant that in principle, however, the cases are the same, to what extent the Alabama case may have been influenced by the local laws of that State I cannot say. It seems to be assumed, both in the argument of Counsel, as well as in the opinion of the Court, that the testator had no *legal* right to *offer* to his slaves the privilege of migrating to Africa, " because it was prohibited by the laws of the State." Be this as it may, the whole tenor of adjudications upon this subject, both in Georgia and elsewhere, have proceeded upon the assumption that slaves, as such, might choose between foreign freedom and domestic servitude.

In *Jordan vs. The Heirs and Distributees of Bradley,* emancipation was made to depend expressly upon the *wish* of the slaves; and the recommendation of the Court to the executor, was to interrogate the slaves as to their desire, in the presence of the legatees and respectable neighbors, and to make a memorandum or record of their answers. And the decree in this case was approved by the Judges in convention, and has been considered as the settled law of the State ever since. (*Dudley's Rep.* 170.)

So, in *Elder vs. Elder's Ex'r,* (4 *Leigh's Rep.* 252,) the testator bequeathed that his negro woman C, and her child A, and C's increase, be given to G D, in trust, to be sent to Liberia, provided the expenses of their transportation would be defrayed by the Colonization Society ; and that the rest of his negroes, *who might be willing to go,* should be left in trust to said G D, to be sent to Liberia in the same manner; but that those who *should prefer to stay* should be given, *within twelve months,* to his brother. Testator's estate being

involved in debts, which the other assets would not suffice to pay, the executor hired out the slaves for several years, to raise a fund out of which to discharge the debts.   The Court of Appeals *held,* that this was an· effectual emancipation of such of the slaves *as preferred* to go to Liberia.   And further, that it was not necessary that they should elect to go within *twelve months,* provided they made such election when offered to them.

"In the construction of wills," says *Carr, J.* "we are to find out the meaning—the intention—the will of the testator; and unless that violates some principle of law, it must be carried into execution.   To my mind, it is just as clear as any form of words could make it, that this testator wished that all his slaves should be given up to Dissosway, to be transported to Liberia, there to be free, if the Colonization Society would pay the expenses of removal, *unless any of them should prefer to stay here and be slaves.*   And such he willed should be the slaves of his brother, the appellant.   I do not believe he had an idea of making their election within *twelve months* a condition which, under all circumstances, should be strictly performed, and on failure of which, they should be the slaves of his brother.   He thought it probable, I suppose, that *the choice* would be submitted to them within the *twelve months;* and meant that all who, upon such submission, *should express a preference for remaining,* should thereupon be handed over to his brother.   The residuary legatee having filed his bill, and thus brought the subject before the Court, the Chancellor very properly appointed commissioners to examine the negroes.   These commissioners have reported that all but one have *elected* to go to Liberia ; that two of them were too young, (one being six and the other two years old,) to make a choice ; and that in these cases they had taken the choice of their mothers.   In this I think they acted very properly. It is certain, that the testator did not, on account of their infancy, intend to condemn them to unconditional slavery; and who so proper to decide for them as their mothers ?"

Such was the view taken of this subject by the Court of Appeals of Virginia.

In *Frazier et al. vs. Frazier's Executors,* (2 *Hill's Ch. R.* 305,) the direction in the will was, that "the negroes be set. free by my executors." And then, after directing a fund to accumulate for the benefit of the slaves, it was directed that this "fund was to enable them to go to St. Domingo or *any part they might choose.*" The Court *held* the will was legal,. and should be executed. And upon a bill filed by the next of kin, claiming the slaves, the executors were ordered to remove them to parts beyond the State, where emancipation was lawful, and there set them free.

In this case, as in the one before us, a latitude of discretion is left to the slaves in the selection of their future home,. not being restricted by the words of the will even to a free country.

The same principle was settled in the celebrated *Ross Case,.* involving property to the value of about a half a million of" dollars. (5 *Howard's Miss. Rep.* 305.) There, emancipation depended upon the *will and election of the slaves.* And: the ground was distinctly taken by the able Counsel who argued against the will, that the slaves, as devisees, were incompetent to choose. The will was sustained and ordered to. be enforced.

In *Leech vs. Cooley, ex'r, &c.* (6 *Sm. & Mar.* 93,) the testator directed his slaves to be set free and sent to Indiana or Liberia, *as they might prefer.* The will was held to be valid, and the executor decreed to proceed in its execution.

But I forbear to multiply cases. The Reports from the slave States are full of them. The reasoning which seeks to invalidate this will upon the ground that slaves, as such, are incapable of choosing, is too technical to commend itself to my approval. Besides, it proves too much. It would go to the full extent of maintaining that freedom could not be conferred *upon a slave at all,* even were there no law prohibiting it; because, being in a state of servitude, he would be incapable of consenting to be free ! Suppose a testator were, by.

his will, to direct his executor to dispose of his slaves, by sale, to such persons *as they might select,* provided they were willing to take them at their appraised value—would not the executor be justified in carrying out the trust? True, slaves are property—*chattels* if you please; still, they are rational and intelligent beings. Christianity considers them as such, and our municipal law, in many of its wise and humane provisions, has elevated them far above the level of the brute. We should deeply regret to be compelled to decide that a benevolent disposition like that referred to, and others that might be put, involving to some extent the volition of the slave, was nugatory. Our examination has furnished us with no such rule, applicable to slavery. It is at war with the whole train of adjudications in this and our sister States, as well as of every other civilized country. Infants and *feme coverts,* notwithstanding the general disability under which they labor, are still capable of consenting and choosing, for many purposes, more especially in matters for their benefit. In the absence of all legal restraint, and upon a point affecting the owner and his slaves only, and where no considerations of public policy intervene, we do not see the paramount necessity of establishing a doctrine so stringent.

2. Another objection urged against this will is, that if these slaves are not freed in Georgia, they are freed no where.

Taking the whole will together, our interpretation of it is, that it directs the executors, first, to apply to the Legislature to manumit the slaves, suffering them to remain in this State; if this cannot be done, then to carry them to some country to be selected by the slaves, where they will acquire freedom, by the operation of the *lex loci,* independent of any act to be performed by the executor.

For myself, I utterly repudiate the whole current of decisions, English and *Northern,* from Somerset's case down to the present time, which hold that the bare removal of a slave to a free country, either by way of transit in travelling, or the convenience of temporary sojourn, will give freedom to the

slave. *African* slavery may, in the rhapsodical language of British Jurists, be inconsistent with the genius of their Constitution—*if so, it is the only species of slavery that is.* But this is certainly not true, under the Constitution of the United States. Upon the principle of international law, properly expounded and applied, to promote the free and unembarassed intercourse between the citizens and subjects of foreign States, we maintain, that the judgment in Somerset's case was wrong. Much more so are the decisions in this country, to the same effect, under a compact formed to abolish *alienage,* and to establish a more perfect union between the States constituting our confederacy, recognizing slavery as it does, in the broadest terms, and guaranteeing its enjoyment. The *status* of the slave under our system, united as we are under the same federal authority, and governed by the same laws, should never have been held to be affected by the temporary residence of the owner in a free State. It was not necessary to the maintenance of any local policy, that the Northern States, in the exercise of their undoubted right to abolish slavery, should have held that citizens of the slave States were thereby prevented from coming among them or passing through with their families and servants. Prior to 1836, the Courts even in Massachusetts had made no such decision. This fungus has been engrafted upon their Codes by the foul and fell spirit of modern fanaticism. Indeed, the Legislatures of many of the free States passed laws securing to citizens of the slave States, who came within their territories, upon business or pleasure, and brought slaves with them, means and facilities to take those slaves back to their domicil. (1 *Rev. Laws of New York,* 657 ; *Laws of Rhode Island,* 607 ; *Purdon's Dig. of Laws of Pennsylvania,* 650 ; *Laws of New Jersey,* 679.)

Still, it cannot be denied that whenever slaves are removed to a free country, with a view to change their former domicil and to remain there permanently, they cease to be slaves, naturally and necessarily. And *a fortiori,* will this conse-

·quence follow, when they are carried to a free State, for the ·express purpose of being liberated.

The right of removal, then, to a free State, was all that was needed to bestow freedom upon these slaves. No express power to emancipate was required. (3 *Monroe's Rep.* 104; 2 *Marshall's Rep.* 467.) I have deemed it necessary ·to be thus guarded upon this delicate and important point.

3. Is this will in conflict with the existing laws of this ·State, prohibiting manumission?

I examined this question somewhat at length, when this ·case was last up, (16 *Ga. Rep.* 496,) and satisfied myself that extra-territorial emancipation was not forbidden by the Statutes of 1801 and 1818. I take this occasion to state emphatically, however, whatever opinions I may have expressed heretofore upon this subject, that I am fully persuaded that the best interests of the slave, as well as a stern public policy, resulting from the whole frame-work of our social system, imperatively demand that all *post mortem* manumission of slaves should be absolutely and entirely prohibited. Slavery is a cherished institution in Georgia—founded in the Constitution and laws of the United States; in her own Constitution and laws, and guarded, protected and defended by the whole spirit of her legislation; approved by her people; intimately interwoven with her present and permanent prosperity. Her interests, her feelings, her judgment and her conscience—not to say her very existence, alike conspire to sustain and perpetuate it. We may not be able to prevent expatriation of the living—to restrain the master in his lifetime from removing whithersoever he pleases with his property; but when the owner has kept them as long as he can enjoy them, shall he, from an ignorance of the scriptural basis upon which the institution of slavery rests, or from a total disregard to the peace and welfare of the community which survive him, invoke the aid of the Courts of this State to carry into execution his false and fatal views of humanity? Is not every agitation of these cases in our Courts attended with mischief? Is not every exode of slaves from the inte-

rior to the seaboard, thence to be transported to a land of freedom, productive of evil? Can any doubt its tendency? Are there not now in our midst large gangs of slaves who expected emancipation by the will of their owners, and who believe they have been unjustly deprived of the boon? Are such likely to be good servants? On the contrary, are they not likely to sow the seeds of insubordination, perhaps of revolt, amongst the slaves in their neighborhood?

Deeply impressed with these views, I have earnestly solicited the immediate attention of the present Legislature, (1855–'6) through the Chairman of the Judiciary Committee of the Senate to the subject. Still, whatever may be the strength of my convictions, I feel bound by the construction which has been put upon the law by the eminent Judges who have preceded me, until the Legislature see fit to intervene. It is due to candor to avow that I entertain not a shadow of doubt that the decision by the Convention, in *Dudley*, is in strict accordance with the true meaning and intent of our Statutes.

Much was said in argument by Governor McDonald, as to the rules for the construction of Acts. They all resolve themselves into one single purpose, namely: to ascertain the meaning of the law. And whatever conduces to that end, may be fairly put in requisition, whether it be drawn from the preamble, title or body of the Act, or from cotemporaneous history or legislation, indicating the peculiar condition and circumstances of the community in whose behalf the Act was passed. A narrow and restricted application of a Statute, is as likely to fall short of the legislative will, as the more unbridled latitude of construction. Both extremes are to be avoided. In my judgment, the law in this case expounds itself and leaves no room for cavil.

The Act of 1801, (*Cobb*, 983,) purports to be an "Act prescribing the mode of manumitting slaves" where? In Liberia? Or Ohio? No! but "in this State." It attempted nothing else; it effected nothing else, as its terms plainly demonstrate. But this Act, restricted as it was in its object,

was found to be insufficient, even for that purpose.  Besides, the Courts had construed the 3d section of this Act too literally.  It was in these words : "It shall not be lawful for the Clerks of the Superior Courts, or any other officer of the State, to enter on record, in any book of record by them kept, *any deed* of manumission or *other paper*, which shall have for its object the manumitting or setting free any slave or slaves ; and the party offending herein, for every deed or other paper so recorded, the sum of $100 to be recovered by action of debt," &c.  Is not this language exceedingly broad ? "Any deed or other paper !"

And yet, when the Supplementary Act of 1818 was passed, more effectually to enforce the Act of 1801, it is declared that the third section of this latter Act should be construed to extend to inhibit the recording only of so much of any instrument (as is therein described) as shall relate to the manumitting or setting free of any slave or slaves.  (*Cobb*, 990.)

We repeat, and it is not without its point in the further examination of this case, that the cardinal rules in the interpretation of Statutes is, that the legislative will must be looked to ; and that this intention of the law-maker is to be deduced from every part of a Statute, compared with every other part ; and that the true meaning and design, when thus elicited, must prevail over the letter of the law.  I will now add another rule, learned by every student while reading *Blackstone*, but too often overlooked in his subsequent professional and judicial career; and that is, that *good sense* must never be departed from in the exposition of a Statute, whatever other sense, literal or latitudinous, may be.

The preamble to the Act of 1818 recites, " That whereas, the principles of sound policy, considered in reference to the free citizens of this State, and the exercise of humanity toward the slave population within the same, imperiously require that the number of free persons of color *within this State*, should not be increased by manumission, or by the admission of such persons from other States *to reside therein*," *&c.*  "Be it enacted, therefore, that the Act of 1801 shall

be strictly enforced," &c.; "that all and every will and testament, deed, whether by way of trust or otherwise, contract, agreement or stipulation, or other instrument in writing, or by parol made and executed for the purpose of effecting, or endeavoring to effect, the manumission of any slave or slaves, either directly, by conferring, or attempting to confer, freedom on such slave or slaves, or indirectly or virtually, by allowing and securing, or attempting to allow and secure, to such slave or slaves, the right or privilege of working for his, her or themselves, free from the control of the master or owner of such slave or slaves, or of enjoying the profits of his, her or their labor or skill, shall be, and the same are hereby declared to be, utterly null and void." And the Act proceeds to inflict a penalty of $1.000 on all persons making, or concerned in making, any such deed or other instrument in writing; and further directs, that the slaves in whose ·behalf the same shall be made, shall be liable to be arrested by warrant; and being thereof convicted in the manner therein prescribed, shall be liable to be sold as slaves at public outcry, and the proceeds appropriated to public purposes. (*Cobb,* 991.)

Without stopping to inquire what becomes of the rights of the next of kin, under the provisions of this Act, if, indeed, it apply to the case, does not the preamble show, conclusively, the nature of the evil intended to be remedied? And will that evil be produced or increased by the execution of this will?

By the 10th section of this Act, it is made the duty of all Courts and Judges to construe the Act and carry the same into operation " according to the spirit, true intent and meaning thereof, as set forth in the preamble."

The mischief, then, was the accumulation of free negroes residing amongst us, from the acts of emancipation by their owners, and by immigration from other States. This was the only evil the law undertook to redress; and the most stringent enactments were adopted for that purpose. The Legislature ·did not intend to impose any other restriction

upon the undoubted right of the citizen, to dispose of this species of property by will, deed or otherwise, as he might please, except by holding him in a state of obedience to its municipal policy as to free negroes.   The State did not intend, by these Acts, to assume jurisdiction, except within her own limits.   The right to remove—to emancipate, is not taken away; it is only prohibited when attempted to be exercised within her own borders.   The State did not expect her judicial process to reach to Liberia or New York, and arrest, by warrant, liberated slaves, with a view to again reduce them to servitude, by having them sold at public outcry.

The Colonization Society was not organized until 1816; and in 1817, by an Act yet in force, the Governor was directed to deliver to this Society Africans illegally imported into this State, and "aid in promoting the benevolent views of said Society, in such manner as he might deem expedient." (*Cobb's Digest,* 989.)   And again, by resolution in 1820, two years after the Act of 1818 was passed, certain Africans, illegally imported, were offered to this Society.   (See *Resolutions of* 1820, *Vol. IV. p. 5 of Resolutions.*)

In view of the degradation of the free blacks, both in the slaveholding and non-slaveholding States of the Union, philanthropists of both sections favored, at first, this scheme of Colonization.   The people to be sent there, were all from the United States, speaking our language, pursuing our habits, professing our religion and imitating our political institutions. It was hoped that they would become a sober, industrious and progressive community, elevating themselves as well as the surrounding natives, in the scale of civilization.   How far these hopes have been realized, it is foreign to my purpose to inquire. It is enough to say and to show, that nothing was more foreign from the thoughts of the men of 1818, than to prohibit a citizen from directing, by his will, that his negroes should be removed out of the State to Liberia or elsewhere, for the avowed purpose of emancipation.   Neither the Act of that year nor its predecessor, were intended to infringe upon this privilege.

And we must expound these Acts in the light of the times in which they were passed.  We are now told, and told truly,. that "slaves constitute a portion of the vested wealth and taxable property of the State; that without them, a large portion of our most productive lands would be worthless; that it would be contrary to her policy, therefore, to part with this vested wealth; this polific source of revenue, with that which alone renders her cotton and rice lands valuable; that it is spreading a dangerous influence among the negroes of the country, for the slaves of whole plantations to acquire their freedom, take leave of the country, and make their departure with great pomp and parade, proclaiming liberty for themselves and their posterity; that it renders those who are left behind dissatisfied, refractory and rebellious, and that it may and probably will, if not checked in time, lead to insubordination and insurrection; that the Colony of Liberia, instead of being an enterprise worthy of encouragement, is the germ whence is likely to spring elements of great mischief to the South.  And although the Colonization Society is established to colonize, on the coast of Africa, such free persons of color as may voluntarily go, or such slaves as may be manumitted by their owners for that purpose, yet, its members and friends look forward to the entire overthrow of slavery in this country, as a consequence of their success, though not as an object or design of their association; that every number of the African Repository, the organ of the Society, is replete with evidence that such is the tendency, if not the design of this scheme."

"That supposing the non-slaveholding States, north-west of the Ohio, were willing to receive our free negroes, (a supposition by the way wholly untrue,) would it be good policy in us to locate them on our borders, beside our great rivers,. forming free negro colonies in constant intercourse with our slaves?  Would not such a population, inhabiting a country near us, become a dangerous receptacle for our fugitive slaves?  Would not the time come, when an attempt to

seize our runaway negroes, would produce serious collision and border war with the States contiguous to us?"

We feel the full force of these arguments. They have been addressed to this and other Courts before, but have failed to produce conviction, for the simple reason that such appeals are made to the wrong tribunal. They should be submitted to the halls of legislation, and not to the Courts of Justice. It is not the province of the Courts *to make* public policy, but simply *to declare it,* as it exists. The policy of a State is to be gathered from its Constitution and laws. Public opinion is too transient and changeable to become a rule of decision. It must take the shape of settled law before the Courts will undertake to enforce it. The policy of Georgia seems to be, at this very day, opposed to the further importation of slaves into the State, and consequently to the increase of this species of population. And although her legislation has fluctuated upon *this subject,* she never has indicated, for the first time, in any manner, her policy to prohibit the exportation of slaves. Such a change as this, I insist upon it, should be inaugurated by the people themselves, either in convention or through the Legislature. Writers on the *Law of Villeinage,* in England, while treating of its final destruction during the reign of *Charles II.* say that "the bent of the English Law is towards liberty." And again, that "the law is always ready to catch at anything in favor of liberty." Now while I concede that our laws, relative to *negro slavery,* manifest no such "bent towards liberty" *at home,* nor are they "always ready to catch at anything in its favor," it must be confessed that no contrary policy can be deduced from them relative to *foreign emancipation.*

But it is insisted that the words of the law are broad enough to prohibit manumission *out of* as well as *within,* the State, by a citizen of the State. The language of the Statutes, I admit, is very general. But every part must be looked to, to ascertain the meaning. And effect must be given to

every clause and passage. And one of the means devised to secure an observance of the law, is inconsistent with the idea of manumission abroad. Under the Act of 1801, the slaves manumitted contrary to its provisions, were declared to be still, to all intents and purposes, as much in a state of slavery as they were before they were set free. (*Cobb*, 983.) And under the Act of 1818, they were made liable to be arrested by warrant, to be issued by any Magistrate, and sold at public outcry. (*Cobb*, 990.) I will not be guilty of the disrespect of imputing to the authors of this law the folly of supposing, that any legal process, emanating from our municipal authorities, could reach beyond our own limits. On the contrary, I refer to these provisions to show that the Legislatures of 1801 and 1818, had in their mind domestic manumission only; and that it was against this evil only that these rigid penal enactments were directed. To our mind it is clear, that these are mere municipal regulations, aiming simply and exclusively at the internal police of the State; and that the emancipation which results from the removal of slaves to a foreign country, is neither within the letter or the spirit of the law. To rid themselves of free negroes, and to prevent the increase within their borders of this obnoxious population, will be found, upon examination, to have been the steady policy of all the slave States. But all their laws, up to a recent period, respecting slaves, and free persons of color, will be found to aim at this end only, and to stop at this point. In several of the States, as in ours, the preamble to their Statutes recites, expressly, that this is the object contemplated. And it would be almost as reasonable to hold that the provisions of our Penal Code, against teaching slaves or selling them spirituous liquors, had an extra-territorial application, as that the Acts of 1801 and 1818 have.

The cases are numerous, in which the Courts have decided that statutory limitations, similar to ours, upon the right of emancipation, are merely police regulations, and do not vitiate or affect manumission, resulting from the operation of a foreign country. (6 *Yerger*, 119; 1 *Bibb.* 422; 3 *Munroe*,.

104; 1 *Leigh's Rep.* 172; 8 *Louisana R.* 475; 11 *do.* 499; 14 *do* 410; 2 *Howard's (Miss.) R.* 837.)

Indeed, the late Chief Justice *Chilton* of Alabama, whose retirement from the Bench may be justly esteemed a great public loss, after a critical and thorough review of all the authorities, justly remarks, that if any point may be considered as settled by the *consistent decisions* of the slave States, the cases establish the proposition, that unless restrained by positive enactment, a testator may, by his will, effect the manumission of his slaves, by vesting the title to them in trustees, for the purpose of their removal to a free State, there to enjoy their freedom. (*Atwood's Heirs vs. Beck, adm'r,* 21 *Alabama R.* 622.)

It may not be unprofitable to advert, briefly, to the Statutes of some of our sister States, and the exposition given to them by their Courts. And if apology be needed for the time consumed in the investigation of this subject, I trust it will be found in the fact, that this is the *third* time this question has been presented for our review, within the last twelve months. *Nor will it be the last.*

The law, as it stood formerly in Mississippi, was in these words: "It shall not be lawful for any person, being the owner of slaves, to emancipate them, unless by his or her last will and testament, attested and proved in the manner required by law; and also prove such slaves have performed some meritorious act for the benefit of such owner, or some distinguished service for the benefit of the State; and such last will and testament shall not have validity until sanctioned by the Legislature; nor until the owner shall have complied with the conditions specified in such act."

In the law of Mississippi, it will be perceived, that there is no declaration by the makers, as there is in the Act of 1818 in this State, that its object and policy were to prevent the accumulation of free negroes at home, by manumission and immigration. And yet, the Courts of that State uniformly held that the Statute did not prohibit a citizen of that State from directing, by will, that his slaves should be removed out

of the State to Liberia or elsewhere, though the avowed intention was emancipation; that the law did not take away the right to emancipate, but qualified it only, when exercised within the limits of the State; and that the Courts would not look beyond the act of removing slaves from the State to their place of destination, to see whether, by the laws of that place, emancipation would be a consequence of such removal. (5 *Howard's (Miss.) Rep.* 305 ; 6 *Sm. & Mar.* 93 ; 7 *Ib.* 663.)

The Act of South Carolina was exceedingly broad. It provided, " that no slave shall be emancipated but by Act of the Legislature." *(Acts of* 1820, *p.* 22.) This is, in a few words, the substance of our law. And from the preamble to the Act, it appears that in our sister State, as here, there was a rapid increase of free negroes by emancipation and admission from other States. And there, as here, the remedy resorted to was, that emancipation should only take place by Act of the Legislature. But what did the Courts of that State hold as to the interpretation of their law? " The provision is general\ and might, from the words, prohibit emancipation out of as well as within the State. But it is a construction altogether by the letter and not by the spirit of the law; for the intention of the Legislature is manifest, to prohibit the .emancipation of slaves *within the State*, except by Act of the .Legislature. The evil was the increase of free negroes within the State. If this is remedied, the end of the law is obtained." *(Per Curiam Frazier and others vs. Frazier's ex'rs,* 2 *Hill's Ch. R.* 304.)

By a subsequent Act, passed in 1841, (11 *Statutes,* 154,) it is made unlawful for executors to carry slaves out of the State, with a view to their emancipation. And a similar law has been passed in Mississippi.

But for the fear of extending this opinion to an unreasonable length, I would examine the laws of the rest of the slaveholding States, together with the judicial construction given to them. But we go no further upon this point, except to remark, that the cases cited by Counsel for the plaintiff in error, do not conflict with the principles established in those

which have been examined; and that the views above pre-
sented, are not shaken in any of them; and that our conclu-
sion is, that every person in this State, *sui juris,* having the
power, by will, to dispose of his own property as he pleases,
may exercise this power in regard to slaves, unless prohibited
by law; and that while the Acts of 1801 and 1818 are un-
questionably opposed to the manumission of slaves in this
State, we see nothing in these Statutes limiting the power of
the testator to send his slaves to Africa or elsewhere, in his
lifetime, there to remain free; or to direct it to be done by
his executor, after his death.   And further, that there is
nothing in the policy of the State, *as declared in these Acts
of the Assembly,* opposed to such intention, in any form.

4. In the next and last place, it is asked, that conceding
all that is said, how and at whose instance is this trust to be
enforced?   It is alleged that these slaves have no civil rights
—can hold no property, nor maintain a suit in Court, either
at Law or in Equity, prior to their emancipation; and that,
therefore, the bequest must be void for want of the means of
enforcing it.

But what reply did the Court make to this position, in
*Frazier's case,* in 2 *Hill?*   "We apprehend that in this case,
and others like it, there is no difficulty; for on a bill filed by
the heirs to partition the slaves, the Court would, if, on look-
ing into the will, they should find that the executors could
execute it by sending the slaves out of the State, and there
set them free, order them to discharge the trust reposed in
them by the testator.   In other cases, the executor's oath to
execute the will, and the fair claim which they have to the
confidence of the Court by the confidence reposed in them
by the testator, are sufficient guaranties that such a bequest
will be faithfully executed."

This opinion is cited with approbation by the Supreme
Court of Alabama, in the case of *Atwood's Heirs vs. Beck,
adm'r,* already referred to.   And in both of them trusts sim-
ilar to this in Water's will were held to be valid.   The same

question has been presented and undergone a thorough discussion in the State of Mississippi, with the like result.

I must say, that to my mind it is clear, that the difficulty in this matter arises from a want of accuracy in stating the proposition. It is laid down, broadly, that a trust is void which cannot be executed. And this is true, if it cannot be executed, for the reason, that it is contrary to law; as for instance, a bequest in a will, directing the slaves of the testator to be manumitted in Georgia. But if it be assumed that a trust is void because of the legal incapacity of the slave to enforce it, then I deny the doctrine. And I maintain, that a testator may create any trust, by his will, which is not contrary to law; and that the executor will be protected in executing it. I go further, and insist, that as an honorable man, it is a high duty not to violate the confidence reposed in him. Should the executor apply to the Court for direction, as in the present case, the Court will thereby acquire jurisdiction and decree the execution of the trust. And the same result would follow, should the next of kin move in the premises.

How common it is for a testator, by his will, to give directions concerning a portion of his estate, not only perfectly consistent with law, but altogether commendable—such as the bestowment of charity, the erection of a monument, or church, or school, and yet, the law has provided no mode of enforcement. Would it, in all such cases, interpose to prevent its enforcement? Would it not, in all such cases, leave it to the voluntary action of the executor? Should he fail to proceed within the time limited by the will, or within a reasonable time, where none is specified, it would be competent for the next of kin, or heirs at law, to ask for a distribution of the fund, which would bring the whole case before the Court, for its direction.

Judgment affirmed.

STARNES, J. concurring.

I concur with my brother LUMPKIN in affirming the judgment of the Court below, though I cannot say that I entirely agree with him or the Court in that reasoning which brings them to the same result with myself.

From the time when this will first came under my examination, (at a previous term of this Court,) I have been of opinion that the true *legal* construction of the clause in question is, that the testator intended the emancipation of William, together with the future increase of the female slaves mentioned, if this were compatible with the laws and policy of Georgia; if not, then that all the slaves mentioned should be sent out of the State to such place as they might select. I so expressed myself when I delivered the opinion for my colleague, Judge LUMPKIN, (who was temporarily absent,) in the first case made upon this will. If I had written out the opinion in that case, I should have so expressed myself again.

Upon examination of the will closely, I became satisfied, that in the other view of the subject, it was necessary *to supply* so much, in order to give connection and meaning to the terms of the will, that it would be venturing on dangerous ground, and might possibly amount to the making of a will for the testator.

I certainly agree with my brother LUMPKIN, in believing that the meaning which is thus attributed to the testator, was not his real intention. I have no doubt he intended that *all* of his slaves specified, if they could not lawfully have their freedom in Georgia, should be sent to a free country. But the questions with which we were pressed were, did the will, as it stood, give legal expression to such an intention? And if not, can the Court undertake, without a violation of sound principles of construction, to supply the requisite meaning?

Recognizing, as I did, the real intention, but doubting that it could be carried into effect with the will as it stood, I ex-

amined that instrument to ascertain whether or not I could find a plain *legal* construction which might effectuate the same result. I found such construction in that exposition of the terms which I have stated.

From such terms, so construed, it was to be inferred that the testator, not fearing to trust his other slaves with his children, was willing that they should remain in bondage with them; but as the issue of those slaves would, in all probability, pass into the hands of descendants who never knew the testator—might have no attachment to his memory or regard for his wishes, or into the hands of strangers, he desired their emancipation. But if this were incompatible with the policy of the laws of Georgia, then he desired all to be sent abroad. According to this reading, the sentence must be construed as follows: "On account of the faithful services of my body servant, William, (the husband of Peggy,) I will and desire his emancipation or freedom, with the future issue and increase of all the females mentioned in this item of my will. If it" (that is, the emancipation of William and these children,) "is incompatible with the humanity," &c. ("humanity," &c. may be readily construed to mean *policy*, or *humanity and policy*,) "of the authorities of the State of Georgia, I direct my qualified executors to send the slaves out of the State of Georgia," &c.

In this view of the subject, nothing has to be supplied, so that it may be said, by way of objection, that we are making a will for the testator; and yet, what we recognize as his real intention, may be carried into effect.

Thus construing the will, I see no difficulty in giving legal effect to the intention of the testator. If it were not compatible with the laws and policy of Georgia, as it certainly was not, at the time of the death of the testator, that William and the issue of the females should be emancipated in the State of Georgia; and if they could not be allowed to remain, thus emancipated, with their kindred, in the State, as they certainly could not without a change of existing laws, then the duty of the executors was, to send them and all the other

slaves specified out of the State of Georgia, provided it was lawful thus to remove slaves from the State of Georgia, for the purpose of giving them freedom, which subject I will presently consider.

But even if this construction be not adopted, and it be held that this will may be so construed, (which seems to be the opinion of my brother LUMPKIN,) as to show that the testator manifested an intention that all the slaves should be emancipated in the State; and in the first instance, if this could be done legally; and if not, that they should then be sent out of the State, I do not see the difficulties suggested by the Counsel for the plaintiff in error; indeed, I do not see some of those which presented themselves to the mind of the Court below; difficulties of which the ingenious and learned Counsel availed themselves to strengthen their line of attack upon the will. I think I can see that the will may be carried into effect, whichsoever of these two constructions be adopted, without the necessity of an application to the Legislature in the first instance; and that it is unnecessary to hold that the testator contemplated such application to the Legislature, and a refusal on the part of that body to emancipate these slaves, before it could be ascertained that it was incompatible with the policy of Georgia that these slaves should be emancipated and remain in the State. According to the view which I take of the matter, it will be perceived, a reasonable construction would have been, that if by reason of the existing state of the law at the death of the testator, (for he might have deemed it possible that the law, as it stood when he wrote his will, would be changed at some future day,) it would be incompatible with the policy of Georgia for these slaves to have their freedom within the State, then that the executors should have authority to remove them. And I think that these executors, by this construction of the will, knowing or being advised, that without a change of existing laws, it was incompatible with the policy of the State for the slaves to have

their freedom in Georgia, might have proceeded at once to send them into a foreign country.

By construing the will in the way I have suggested, and preserving a logical connection of its terms, we cause to vanish the difficulty so earnestly presented by the learned Counsel for the plaintiff in error, viz : that the first portion of this clause, " on account of the faithful services of my body servant, William, I will and desire his emancipation, with the future increase of the female slaves," &c. was intended " to effect emancipation absolutely, in the first instance, and that what follows is a mere expression of a desire, that if such emancipation was inconsistent with the humanity or policy of Georgia, the slaves should be sent out of the State, and has nothing to do with their emancipation."

The ingenious Counsel were enabled to ply this argument with great force, aided as they were by the idea, that the testator designed the emancipation of his slaves absolutely and within the State, and wanted the consent of the Legislature to that arrangement.    But if this could not be effected, as a secondary consideration, desired that they should be removed into a foreign country.

Such was the objectionable provision in *Butler's Will,* considered in the case of *Trotter, adm'r, vs. Blocker and Wife,* (6 *Port.* 269,) and by construing the provisions of this testament so as to exhibit an analogy with that will, the learned Counsel sought to obtain the benefit of the very able decision in that case, made by the Supreme Court of Alabama.    The decision there was put expressly upon the ground that the bequest of freedom to the slaves, was to take effect *within the State,* and that the slaves were made the legatees of their own freedom.    On this account, and for this reason, the bequest was held to be void.    Chief J. *Chilton* of that Court, when speaking of this case, in the subsequent case of *Atwood's Heirs vs. Beck, adm'r,* (21 *Ala.* 612,) says : " In Butler's will, the slaves were declared free in this State, and provision was made, if they could not remain in the State in that condition, for their removal, while in the will before us, the

slaves are to continue such in this State, and the executors are their owners, but for the purpose of taking them to a free State, where they may enjoy their freedom."

So, in this case, if it could be shown that the testator intended that the slaves should take their freedom in the State; but if not allowed to have it here, then they should be removed, the bequest might in like manner be held illegal. The view which I take of the matter, it will be seen, obviates this difficulty. That reasonable view takes the will *as a whole*, and construes it to mean, that the slaves shall be emancipated, if that emancipation be compatible with, or in other words, not opposed to the policy of the State at the time of the testator's death; and that if it were so opposed to the policy of the law, his executors should send them out of the State of Georgia.

I see no difficulty in finding words of manumission in this latter direction. As was shown by my learned colleague, in the first case between these parties, (16 *Ga. R.* 496,) no form of words, and no particular act, is necessary in order to effect manumission. Whatever is intended to express a withdrawal of the master's dominion over the slave, amounts to manumission, where manumission is in any way permitted. Such an act, appears to be a direction by a testator, that his executors shall send his slaves out of the State, wherever they may select a home.

A practical objection was urged, growing out of the difficulty of a selection being thus made by the slaves. The rule suggested by the Court below, was reasonable, viz: that a selection should be made by a majority of the slaves, and this should be adopted by the executors. But this is really only a question of inconvenience. It would be possible for the executors to send these slaves to separate and distinct places, as these were selected by different individuals of them; and it might be possible that one or more would not select any place. In such event, he, she or they would remain in a state of servitude to the heirs.

I can see no force in the objection, when applied to a case

like that before us, (which was also pressed in the case of *Baker's Will*, 6 *Port.* 269,) to the effect, that a slave has no *capacity* to choose servitude or freedom; and therefore, emancipation cannot be effected by leaving to him such selection.

This objection has its foundation in the proposition which we find in the case last cited, viz: that "it is essential to every gift, that there should be a *donor*, a *donee*, and a *thing given*, and that the donee must have capacity to take and hold;" and that a slave has no such capacity. But this proceeds upon the idea, that the manumission is to take effect *within the State*. If the slave be freed by being sent out of the State, into a State where he may have his freedom, there is certainly no difficulty as to a donee, &c.

Undoubtedly *the master* has the legal capacity to direct that his slave shall be sent abroad to be manumitted, if there be no law forbidding it. If so, and he direct that his slave shall be manumitted, by choosing some free State into which he shall be sent by his (the master's) means, the only question of capacity which relates to the slave is, whether or not he has capacity to desire to be sent to some such country, and to articulate that desire. It is, then, the master's capacity of manumitting, which takes effect through the selection of the slave, of the place to which he will be sent, and through the act of sending him there. This it is which determines his condition, and not his legal capacity to determine anything.

One of my colleagues suggested a difficulty, by asking, what was the *status* of the slave, who was, by the will, directed to be sent into a free country, during the period elapsing between the death of testator and the slave's removal? And further, if he had a right to freedom, or to be sent out of the State by virtue of the will, how could that right be enforced, and by whom?

The reply which occurs to me is, in the first place, that the condition of the slave during such period, would be that of a slave whom, by virtue of the directions in the testator's will, *the executor had the right* to send out of the country into a state of freedom. If he remained, he would be a slave still.

If he were sent into a land of freedom, he would be free.   The Civil Law, I believe, applied the term *statu liber* to such a person.

In answer to the second branch of the question, I reply, that *the slave's right* in the premises, is not the thing to be ascertained, or which determines *the legal duty* of the executor.   *It is the executor's right.*   And though the slave may have no legal right in the premises, by reason of his legal incapacity, and no remedy for such rights as he may have, still, if, by the law of the testator's will, the executor has the right to send him out of the country, he may, in this way, of course, be legally emancipated.   At all events, if the executor in such a case do send him out of the country, no one can gainsay him.

The executor's right and duty in the premises, are prescribed by the law of the testor's will.   Where there is no municipal law forbidding it, the testator can certainly make such a law for himself in his will, and the same reason exists why the executor should carry it into effect, as why he should erect a monument or tombstone of specified character and cost, if so directed by the testator's will.   It will not be disputed, I suppose, that if such directions were given by a testator, it would be the duty of his executor to carry them into effect, (especially if they were reasonable,) and that he would be sustained by a Court of Justice in so doing, or instructed so to do by a Court of Equity, if he asked instructions on this head.   Yet, it could not be said that the tombstone had any right in the premises, or perhaps, that any remedy lay against the executors, by which the erection of the stone could be enforced.

I have said that the executor's right and duty in such a case is prescribed by the law of the testator's will.   There should not be a doubt, it seems to me, that the testator has the right to make this his will.   In his lifetime, he could have sent as many of his slaves as he pleased into a free country.   If so, why can not he direct that they shall be taken there after his death?   Why not, unless the law prohi-

bits it, as well send them into a foreign country, as to give them to A or B ?

In the case above cited, of *Atwood's Heirs vs. Beck,* Ch. J. *Chilton* on this subject, says : " It cannot, for a moment be questioned, but that Atwood, while living, could have made the same disposition of his property which he directs his executors to make. He might have removed the slaves in person, or by his agent, and there is no law forbidding it. Who is the executor ? He is but the representative of his testator, and is influenced by his will to do what he desires, if such desires be lawful. The testator, as respects his lawful desires, &c. still lives in the executor, in legal contemplation." (*Pow. on Dev.* 150.)

If, then, by the law of the testator's will, the executor has the right to send the slave out of the State, the practical question is determined, and, it matters not what are the slave's rights, or his means of enforcing them. And when the slave is so sent into a free State, he is emancipated.

It was urged, on the part of the Counsel for the plaintiffs in error, and is maintained by my brother BENNING, that such removal of slaves from our State, is contrary to the laws of the State, and to its policy.

Governor McDonald argued, I believe, that the Act of 1818 did not forbid manumission, by sending slaves out of the State, but the Act of 1801 and the policy of the State did. Now, it is very clear, to my mind, that neither of these Acts inhibit such manumission.

The Act of 1801 declares, that " The said slave or slaves, so manumitted and set free, contrary to the true meaning and intent of this Act, shall be still, to all intents and purposes, as much in a state of slavery as before they were manumitted and set free by the party or parties so offending." The application of such a provision to slaves sent out of the State, and into a free country, would have been quite absurd. And it is not reasonable to suppose, that if the Legislature, when passing this Act, had had in mind slaves so sent into the free States, or to any foreign country where slavery did

Cleland *et al. vs.* Waters *et al.* ex'rs, &c.

not exist, they would have thus left the matter, and not have drawn a distinction which might have relieved them from the imputation of intending to enact so vain a thing.    The emancipation contemplated by the Act must, therefore, have been manumission within the State.

The Act of 1818, referring to slaves who may be the subjects of intended manumission in the wills, deeds, &c. which it has in contemplation, declares that "each and every slave or slaves in whose behalf such will or deed shall have been made, shall be liable to be arrested by a warrant, under the hand and seal of any Magistrate *of this State;* and being thereof convicted, shall be liable to be sold as a slave or slaves." Of course these terms refer to emancipation *within the State,* for they contemplate an arrest of the slave by a Magistrate *of the State, and a sale into slavery in the State.* In the preamble of the Act, too, language is employed which shows the same thing.

What the law of our State is, and was intended to be, these Statutes thus clearly show, as I think; and unless the policy of a law is to be sought and found outside of the law itself, and of what it was intended to enact, (as I have elsewhere suggested in a decision on this subject,) I do not see that it can properly be said that emancipation of slaves, by sending them out of the State, is contrary to the policy of our law.

But as I have elsewhere said, and as has been remarked by my brother LUMPKIN in the first case between these parties, this point has been so often decided by our Courts, that it might very properly be considered as not now an open question in our State.

As to what may be the true and sound policy of the State in this regard, without reference to existing laws, that is another question—a question for the Legislature, and one which, like an edged tool, as it is, should be handled very carefully.

I have no difficulty in recognizing that as a bad policy, which sends slaves into the free States of this Union, where they serve to swell the numbers of that wretched and thrift-

less throng of free negroes, who, themselves the subjects of suffering, without sympathy from their abolition neighbors, are yet contributing to the agitation which engenders so much fanatical sympathy for their contented and happy kindred in slavery. But whilst I recognize this as impolitic, I am not prepared to admit, as a question of political economy, that the number of slaves in our State should never be diminished, by such manumission as sends them to Liberia or some foreign land.

To determine a policy for a great State, reference must be had to the future time, as well as to the present; and he who will give himself the trouble to look into the statistics of the slave-holding States for the last fifty years, will find some important facts, which should cause him to pause before deciding that no slaves should ever be emancipated, by being sent out of our State. This judgment is not the proper place for such details, and I refrain from mentioning them.

There are other reasons, founded in humanity, which eloquently protest against the proposition, that under no circumstances, should slaves be sent to freedom in a foreign land; and may well cause the legislator to hesitate before declaring this to be the law. In view of these, I am not yet satisfied that such should be the law. Some of these reasons are readily suggested by the circumstances of this case—circumstances which teach us a sorrowful lesson of human nature and its infirmities, and should cause all to be thankful, who have not the occasion which this testator had to invoke for their relief, the humane policy of the State.

BENNING, J. dissenting.

I dissent from the judgment rendered by the Court in this case.

I think that this part of the third item of the will, " on account of the faithful services of my body servant, William, (the husband of Peggy,) I will and desire his emancipation, with the future issue and increase of all the females mentioned in this item of my will," is void. And I think so for the same reasons for which I thought the will of Bledsoe void. Those reasons I have stated in my dissenting opinion in the Bledsoe will cases, which were before this Court at Milledgeville, in May, 1855. (18 *Ga. R.*) It is needless, therefore, to repeat the reasons here.

I may remark, however, that I do not think that the effect of the invalidity of the part of the will aforesaid, was such as to render the *whole* will void. The rest of the will I consider good; i. e. all of the rest that is disconnected from this part.

This opinion I owe to a more careful consideration of the second section of the Act of 1801, which prohibits manumission, than that which I gave to the section when investigating the questions in the Bledsoe will cases. The section is in these words: " The third section of the said Act, hereinbefore referred to, shall be construed to inhibit the recording only of so much of any instrument (as is hereinbefore described) as shall relate to the manumitting or setting free of any slave or slaves." (*Pr. Dig.* 795.)

At the same time, I must still admit that I see much in the rest of the Act, that favors the notion that this part of the will is not only void itself, but renders the rest of the will void.